## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

**KEON V. LIPSCOMB,**

      **Plaintiff,**

**v.**

**MATTHEW BLAKE,**
**DUSTIN CHITTY, and**
**JOHN RESTOFF,**

      **Defendants.**

**Case No. 24-cv-1233-NJR**

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Keon V. Lipscomb, an inmate of the Illinois Department of Corrections who is currently incarcerated at Pontiac Correctional Center, brings this action pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights while at Menard Correctional Center. Lipscomb's claim alleges that Matthew Blake used excessive force against him. He also alleges Dustin Chitty and John Restoff failed to intervene in the use of force.

This matter is currently before the Court on a motion for summary judgment filed by Defendants Matthew Blake, Dustin Chitty, and John Restoff (Doc. 29). Defendants argue that Lipscomb failed to exhaust his administrative remedies prior to filing his lawsuit. Lipscomb filed a response in opposition to the motion (Docs. 32, 33). Defendants

1

filed a reply brief (Doc. 34).[1] On July 15, 2025, the Court held an evidentiary hearing pursuant to *Pavey v. Conley*, 544 F.3d 739, 740-41(7th Cir. 2008).

## BACKGROUND

On May 6, 2024, Lipscomb filed his Complaint alleging constitutional violations and state law claims related to an incident of excessive force (Doc. 1). Lipscomb alleged that on March 28, 2024, he was at the Carbondale Memorial Hospital and was awaiting transport back to Menard (Doc. 12, p. 2). He was in full body chain and shackles (*Id*.). Dustin Chitty and another officer were waiting for Matthew Blake and John Restoff to assist with the transport (*Id*.). When Blake arrived, he told Lipscomb he was going to kill him. Blake shoved Restoff out of the room, and then pushed Lipscomb against the hospital bed, choking him and punching him over 20 times (*Id*.). Lipscomb alleges that the struggle was loud, and everyone could hear the beating, but neither Chitty nor Restoff intervened to stop the assault (*Id*.). After the assault, Chitty helped carry Lipscomb to the transport vehicle (*Id*.).

After review of the Complaint pursuant to 28 U.S.C. § 1915A, Lipscomb was allowed to proceed on the following counts:

Count 1:    Eighth Amendment excessive force claim against Blake for assaulting Lipscomb.

Count 2:    Eighth Amendment failure to intervene claim against Chitty and Restoff for failing to stop or intervene in the assault on Lipscomb.

---

[1] Lipscomb submitted a subsequent affidavit, but the filing focuses on allegations and defendants that are not a part of this lawsuit (Doc. 35).

Count 3:     Illinois state law assault and battery claim against Blake.

Count 4:     Illinois state law intentional infliction of emotional distress claim against Blake, Chitty, and Restoff.

(Doc. 12, p. 3-4).

## A. Summary Judgment Motions

Defendants argue that Lipscomb failed to exhaust his administrative remedies prior to filing his Complaint. Lipscomb's Complaint alleged that the assault at issue occurred on March 28, 2024. He filed his Complaint less than two months later, on May 6, 2024. Between the date of the assault and the date of the filing of his Complaint, Defendants argue that no grievances were received by the Administrative Review Board ("ARB") (Doc. 29-1, p. 1).

Lipscomb's Cumulative Counseling Summary indicates that his counselor attempted to see him on March 28, 2024, but he was in the healthcare unit for a crisis event (Doc. 29-2, p. 2). An earlier entry from March 7 noted that Lipscomb inquired about his ability to write a grievance while on crisis watch (Doc. 29-2, p. 3). He informed Counselor Leah Strong that mental health staff informed him he could be pulled out of his cell for Strong to assist him in writing a grievance (*Id*.). Strong noted that she was not aware of the policy but would ask her supervisor (*Id*.). A subsequent entry that same day from an unnamed staff member noted that a law library clerk assisted Lipscomb in

filling out a grievance and turned it in that same day (*Id*.). On April 1, 2024, the counselor received three grievances from Lipscomb unrelated to this lawsuit.[2]

Lipscomb argues, however, that he was on crisis watch during the relevant time and lacked access to grievances. He notes that he was on suicide watch from February 22, 2024, until August 27, 2024. He points to entries in his Cumulative Counseling Summary where he requested help with writing grievances due to his status on crisis watch (Doc. 29-2, pp. 1-2). On April 25, 2024, notes from his counselor indicated that Lipscomb requested someone come to his crisis cell to write a grievance for him (Doc. 29-2, p. 1). Similarly, on both May 10 and May 16, Lipscomb requested help writing a grievance (*Id*.).

On April 12, 2024, Lipscomb also spoke to a behavioral health technician and noted that the technician was supposed to help him write grievances and note his concerns (Doc. 33, p. 17). The technician explained that the crisis check-ins were not for that purpose, but that Lipscomb could be scheduled for a one on one (*Id*.). On April 20, 2024, Lipscomb spoke with a behavioral health technician and indicated he needed help from someone to write and file his grievances (Doc. 33, p. 13). Four days later, during his daily crisis visit, he again informed the behavioral health technician that he was being denied grievance forms, and he needed to file a grievance due to deadlines (Doc. 33, p. 11). The

---

[2] At the evidentiary hearing, defense counsel clarified that the grievances previously identified as filed on April 1, 2024, were not related to the claims in this lawsuit nor were they new grievances. Instead, the grievances were previously filed grievances that Lipscomb appeared to be seeking clarification or status in the grievance process. One of the grievances, dated September 5, 2023, dealt with grievances he attempted to submit in regard to a July hunger strike (Doc. 29-4). Another grievance alleged that another officer assaulted him on August 24, 2023 (Doc. 29-3).

technician noted that Lipscomb had access to a crisis smock, blanket, mattress, and finger foods, but no utensils (*Id.*).

## B. Evidentiary Hearing

On July 15, 2025, the Court held a joint evidentiary hearing in *Lipscomb v. Wills*, Case No. 24-cv-1590-NJR, *Lipscomb v. Wills*, Case No. 24-cv-1716-NJR, and this case. The Court heard testimony from Lipscomb, counselor Sarah Quick, and Administrative Review Board ("ARB") Chairperson Ryan Nothnagle.

### 1. Lipscomb

Lipscomb testified that while on suicide watch, he spoke to mental health staff on a daily basis and requested help with filing grievances. He also pointed to the entry in his counseling summary where he asked Counselor Strong how to file a grievance without access to grievance forms and pens. In response, a clerk from the library came to his cell and filed the grievance for him. He was able to file that grievance in March but was not able to file any additional grievances because officers told the library clerk not to help him.

Lipscomb testified that he informed mental health staff about his complaints during their daily appointments in order to create a paper trail of his claims and his requests for grievances. He learned that mental health staff reported all his statements to the warden. In response, he requested grievances and explained his issues to mental health staff to relay his issues to the warden. He was not allowed access to a pen or paper because he was on crisis watch. Lipscomb acknowledged sneaking a pen into his cell from an officer. He also had paper in the form of mail that he received. Lipscomb testified that

5

he wrote his Complaint for his case on old pieces of mail in his cell. Although individuals were able to smuggle pens to Lipscomb, he testified he was unable to get grievance forms from anyone.

Lipscomb also testified that he believed he was in imminent danger because the environment in crisis watch was hostile. He would get into arguments with the officers, and they would fight and disrespect him, have other people mistreat him, spray him with mace, and refuse him showers. He believed he was being mistreated and in danger.

### 2. Sara Quick

Sara Quick is currently assigned as a temporary grievance officer but has been employed at Menard in other roles since March 2004. Quick reviewed the grievance logs, the log where grievances are stamped as received, for the relevant time period and there was only one grievance received by the grievance office from Lipscomb from March 28, 2024, through July 16, 2024. That grievance was dated March 28, 2024.

Quick testified that inmates on crisis watch are able to file grievances. They speak to mental health staff every day. The inmate can inform mental health staff of his need to write a grievance, and that request gets relayed to clinical services. The clinical service counselor will then go to the unit, take the inmate to a room, and transcribe the grievance for the inmate. The counselor then initials the grievance to note it was written by the counselor.

When asked by Lipscomb whether law library clerks are ever sent over to write grievances for an inmate on crisis watch, Quick indicated she was not aware of that procedure. She insisted that the grievance is written by the counselor in a special room in

the crisis unit. She noted that it was the same room used by mental health to talk with the inmates, and there are approximately five rooms in the crisis watch unit.

### 3. Ryan Nothnagle

Ryan Nothnagle testified that he receives grievances and documents them on a program called IGRV. He testified that the ARB did not receive any grievances from Lipscomb from March 28, 2024, through July 16, 2024.

### LEGAL STANDARDS

"Summary judgment is proper if the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact such that [the defendant] is entitled to judgment as a matter of law." *Wragg v. Village of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010). Lawsuits filed by inmates are governed by the provisions of the Prison Litigation Reform Act ("PLRA"). 42 U.S.C. §1997e(a). That statute states, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* The Seventh Circuit requires strict adherence to the PLRA's exhaustion requirement. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (noting that "[t]his circuit has taken a strict compliance approach to exhaustion"). Exhaustion must occur before the suit is filed. *Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004). A plaintiff cannot file suit and then exhaust his administrative remedies while the suit is pending. *Id.* Moreover, "[t]o exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir.

2005). Consequently, if a prisoner fails to properly utilize a prison's grievance process, "the prison administrative authority can refuse to hear the case, and the prisoner's claim can be indefinitely unexhausted." *Dole*, 438 F.3d at 809.

In *Pavey v. Conley*, 544 F.3d 739, 740-41(7th Cir. 2008), the Seventh Circuit held that "debatable factual issues relating to the defense of failure to exhaust administrative remedies" are not required to be decided by a jury but are to be determined by the judge. Thus, where failure to exhaust administrative remedies is raised as an affirmative defense, the Seventh Circuit set forth the following recommendations:

> The sequence to be followed in a case in which exhaustion is contested is therefore as follows: (1) The district judge conducts a hearing on exhaustion and permits whatever discovery relating to exhaustion he deems appropriate. (2) If the judge determines that the prisoner did not exhaust his administrative remedies, the judge will then determine whether (a) the plaintiff has failed to exhaust his administrative remedies, and so he must go back and exhaust; (b) or, although he has no unexhausted administrative remedies, the failure to exhaust was innocent (as where prison officials prevent a prisoner from exhausting his remedies), and so he must be given another chance to exhaust (provided that there exist remedies that he will be permitted by the prison authorities to exhaust, so that he's not just being given a runaround); or (c) the failure to exhaust was the prisoner's fault, in which event the case is over. (3) If and when the judge determines that the prisoner has properly exhausted his administrative remedies, the case will proceed to pretrial discovery, and if necessary a trial, on the merits; and if there is a jury trial, the jury will make all necessary findings of fact without being bound by (or even informed of) any of the findings made by the district judge in determining that the prisoner had exhausted his administrative remedies.

*Id*. at 742.

## A.  Illinois Exhaustion Requirements

As an IDOC inmate, Lipscomb was required to follow the regulations contained in IDOC's Grievance Procedures for Offenders ("grievance procedures") to properly exhaust his claim. 20 Ill. Administrative Code §504.800 *et seq*. The grievance procedures first require inmates to file their grievance with the counselor within 60 days of the discovery of an incident. 20 Ill. Admin. Code §504.810(a). The grievance form must:

> contain factual details regarding each aspect of the offender's complaint, including what happened, when, where and the name of each person who is the subject of or who is otherwise involved in the complaint. This provision does not preclude an offender from filing a grievance when the names of individuals are not known, but the offender must include as much descriptive information about the individual as possible.

20 Ill. Admin. Code §504.810(c). Grievances that are unable to be resolved through routine channels are then sent to the grievance officer. 20 Ill. Admin. Code §504.820(a). The Grievance Officer will review the grievance and provide a written response to the inmate. 20 Ill. Admin. Code §504.830(a). "The Grievance Officer shall consider the grievance and report his or her findings and recommendations in writing to the [CAO] within two months after receipt of the grievance, when reasonably feasible under the circumstances." 20 Ill. Admin. Code §504.830(e). "The [CAO] shall review the findings and recommendation and advise the offender of his or her decision in writing." *Id.*

If the inmate is not satisfied with the CAO's response, he or she can file an appeal with the Director through the ARB. The grievance procedures specifically state, "[i]f, after receiving the response of the Chief Administrative Officer, the offender still believes that the problem, complaint or grievance has not been resolved to his or her satisfaction, he or she may appeal in writing to the Director. The appeal must be received by the

Administrative Review Board within 30 days after the date of the decision." 20 Ill. Admin. Code §504.850(a). The inmate shall attach copies of the Grievance Officer's report and the CAO's decision to his appeal. *Id.* "The Administrative Review Board shall submit to the Director a written report of its findings and recommendations." 20 Ill. Admin. Code §504.850(d). "The Director shall review the findings and recommendations of the Board and make a final determination of the grievance within six months after receipt of the appealed grievance, when reasonably feasible under the circumstances. The offender shall be sent a copy of the Director's decision." 20 Ill. Admin. Code §504.850(e).

The grievance procedures allow for an inmate to file an emergency grievance. In order to file an emergency grievance, the inmate must forward the grievance directly to the CAO who may determine that "there is a substantial risk of imminent personal injury or other serious or irreparable harm to the offender" and thus the grievance should be handled on an emergency basis. 20 Ill. Admin. Code §504.840(a). If the CAO determines the grievance should be handled on an emergency basis, then the CAO "shall expedite processing of the grievance and respond to the offender" indicating to him what action shall be taken. 20 Ill. Admin. Code §504.840(b). If the CAO determines the grievances "should not be handled on an emergency basis, the offender shall be notified in writing that he or she may resubmit the grievance as non-emergent, in accordance with the standard grievance process." 20 Ill. Admin. Code §504.840(c). When an inmate appeals a grievance deemed by the CAO to be an emergency, "the Administrative Review Board shall expedite processing of the grievance." 20 Ill. Admin. Code §504.850(f).

DISCUSSION

Defendants argue that Lipscomb failed to file any grievances during the short period between the incident at issue in this case in March 2024 and when he filed his Complaint on May 6, 2024. Lipscomb does not dispute that he did not file any grievances about his claims but argues that he was on crisis watch and lacked access to grievance forms or any ability to file a grievance. Defendants bear the burden of proving that Lipscomb failed to exhaust his administrative remedies. *Pavey v. Conley*, 663 F.3d 899, 903 (7th Cir. 2011).

The Court finds Lipscomb's testimony about his inability to file grievances while on crisis watch to be credible. Lipscomb testified that he tried to file grievances but could not write them on his own because he was on crisis watch and, instead, was forced to request help with writing his grievances.[3] His testimony is supported by several mental health progress notes from the relevant time period where he consistently requested access to grievances and the grievance process (Doc. 33, pp. 11, 13, 17). On April 12, 2024, Lipscomb specifically asked the mental health professional for help writing a grievance, noting that the mental health staff were supposed to sit down and help him write grievances and take down his concerns (*Id.* at p. 17). The mental health professional responded that mental health was not used for those purposes but that he could schedule Lipscomb for a "one on one." (*Id.*). The progress note does not indicate the nature of a

---

[3] Lipscomb apparently did have access to pen and paper because he was able to file his Complaint. But Lipscomb testified that a pen was smuggled into his cell, and he used pieces of mail to write his Complaint. His Complaint is, indeed, short, handwritten, and appears to be written on scraps of mail and other paper (Doc. 1, pp. 2-3). There is no evidence in the record to suggest he had access to grievance forms in his cell.

11

"one on one" meeting, nor is there any indication in the records that one was ever scheduled for Lipscomb. Lipscomb's Cumulative Counseling Summary also documents several requests in April and May for help writing grievances (Doc. 29-2, p. 1). None of the entries indicates that someone was sent to Lipscomb's cell to write a grievance.

Not only do the mental health progress notes and Cumulative Counseling Summary support Lipscomb's testimony, but the documents also directly contradict Sara Quick's testimony about filing grievances while on crisis watch. She testified that while on crisis watch, an inmate can inform mental health staff during their daily visit that the inmate needs to file a grievance. Then, someone from clinical services will pull the inmate out of his cell and help him draft a grievance. But the progress notes demonstrate that Lipscomb was continually asking for help writing a grievance, and there is simply no evidence that he was pulled out of his cell to draft one. Further, the Cumulative Counseling Summary indicates that on March 7, 2024, Lipscomb inquired about being pulled out of his cell to write a grievance, and Counselor Strong indicated that she was not aware of that policy (Doc. 33, p. 7). Instead, a law library clerk was sent to draft a grievance at Lipscomb's cell (*Id*.). Although Quick testified to the policy, the documents in the record make clear that the policy was not followed in this case. Lipscomb specifically asked Strong about this policy, and she had never heard of it. He was clearly asking for help with grievances from mental health staff, and the records are silent as to whether that help was provided.

Thus, the records support Lipscomb's testimony that the grievance process while on crisis watch was unavailable to him during this period. *Ross v. Blake*, 578 U.S. 632, 644

(2016) (Administrative remedies can be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process."). *See also Reid v. Balota*, 962 F.3d 325, 329 (7th Cir. 2020); *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). The records support Lipscomb's testimony that he made requests to obtain grievances. Further, the records are silent as to whether officials sought to accommodate those requests. In fact, it appears there was confusion between mental health and the counselor as to the actual policy on filing grievances on crisis watch. Further, Defendants have failed to offer any evidence that Lipscomb had access to the grievance process during the relevant time.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is **DENIED**.

**IT IS SO ORDERED.**

**DATED:  July 22, 2025**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**